Will the attorneys and parties who are going to argue, please take a seat. And the attorneys or anyone who is going to argue, please approach the podium, identify yourselves and the party you represent and indicate to the court how much time you would like to save for rebuttal. Now I did send out an order earlier about conferring on how much time each of you were going to use within your allotted time, correct? Yes? Yes. Okay, so please approach the podium. Everyone who is going to argue. Call to modem for the appellant. I'd like to reserve... Or the plaintiff. The plaintiff. The plaintiff. I swear your last name, please. O, D, I, M as in Mary. And I can reserve five minutes for rebuttal. Very well. Good afternoon. Gina Valgetero, would you like me to spell that? Please. J, E, N, A. V as in Victor. A, L as in Larry. D as in dog. E, T as in Tom. E, R, O. And I represent North Shore University Health System. Okay, how much time would you like for rebuttal? Probably eight minutes if we can. Okay. We'll give you enough time to complete a thought at least. Okay, eight minutes. Thank you. My co-defendant counsel. Good afternoon, your honors. My name is James Abbott. I represent Jeremy Pfeiffer. And I would anticipate no more than ten minutes on behalf of Mr. Pfeiffer. Okay. Hi, I'm Linda Jacobs, formerly known as Linda Garten. I'm pro se, and I'm waiving my time for the other lawyers. But I am here to answer questions if you have any for me. We're not lawyers. That's the best news we've heard. Thank you. All right. Mr. Odom, you're first. Have a seat, everybody. I'd like to remind everybody that the microphone is for recording purposes, not for amplification. So if you want to be heard in the back of the courtroom and up here, please keep your voice up. Mr. Odom. Thank you. Again, my name is Carl Tillerton for the plaintiff, Ryan Garten. In the vague, vague distance past, I kind of remember being asked to recite ABCs and giving A, B, C, D in order. I also remember, I think, being asked to count my tens and giving those in order. One, two, three, four. And I'm sure I was corrected if I went out of order. This case is about order. The Mental Health Disabilities Act sets up a statutory scheme that orders the disclosure, meaning putting it in order, orders the disclosure of mental health records. That order was violated. As surely as one, two, five, six is not in order. The Mental Health and Disabilities Act says that before any mental health record, any mental health record can be disclosed, a court must be moved and the owner of those records, that is the patient, must have an opportunity to be heard. First step. It is mandatory. The second step is that the court issues an order directing that a subpoena may issue only if the court finds that it is appropriate. The third step is that the court receive the record subject to the subpoena and conduct a second judicial oversight to determine whether or not those records ought to be reviewed, one, in camera, and if they should be reviewed, whether they should be disclosed. That is the statutory scheme. Is the preliminary, doesn't the party whose records, don't they have to put it in issue first? That is one of the exceptions so that the reviewing court may make a determination that the records that are before it may be disclosed because the party who owns them has put his mental status in issue. So that's an exception. In this case, let me dial back and tell the court that this, the parties in this case, Mr. Ryan and his former wife, were in the middle of a contested post-decree divorce. There was a pending citation, civil contempt order and petition on file. And the mental health records of Mr. Ryan were sought by his former wife in order to gain some advantage or traction in the defense against the contempt citation. And for other purposes. She did say she was going to use those records against him to keep his children away from him. In any event, her lawyer, Mr. Pfeffer, one of the parties on this appeal, issued unilaterally, without going to the first step, a subpoena. Served that subpoena on North Shore Hospital. North Shore Hospital answered the subpoena by sending mental health records of Mr. Ryan to the court. First step. Outside of the statutory scheme provided by the Illinois legislature. Second step. Mr. Ryan found out about this, interposed objections. At the same time as the special prosecutor who was designated to prosecute the indirect contempt citation, interposed her own objections. Was Mr. Burton pro se at that time? He was not pro se at that time. Who represented him? Your firm? A law firm represented him. Your firm? No, no, I did not. A different law firm. But the lawyer representing the state, of course, was the one tasked to defend, to prosecute the indirect citation. His private lawyer in the divorce action couldn't do that. After interposing objections, the court, finding that step one of the statutory scheme hadn't been followed, entered an order directing Attorney Pfeffer to reissue the subpoena, to follow the steps. Attorney Pfeffer photographed the subpoena and sent it out to North Shore. What happened to the first set of records? The first set of records remained with the court. After sending the second subpoena, photocopied subpoena to North Shore, North Shore sent a full additional set, second set, to Attorney Pfeffer's office where it was opened. A third set was produced to the court and presented to the court at the hearing on, the second hearing, on whether or not the records should be disclosed. Pursuant to the second subpoena, the records were sent out twice? Once to the attorney and once to the court? That's correct. That's correct. And then just one other question, going back to Justice Griffin's question. The first set of records, and I could be mistaken, but I thought I read something where those records were sent back to the hospital. They were not. No records were sent back to the hospital. So that set, the first set stayed with the court? That's correct. To the best of your knowledge. The second subpoena went out. One set went to the requesting attorney, the attorney who sent the subpoena. That's correct. And one copy was sent to the court or delivered to the court? Was brought to the court. Was brought to the court for that second hearing. By the hospital? By the hospital. Okay. Now, this is another question, though, because the other side argues that the court cured the defect by issuing the second, by having the second subpoena issued. And that is an admission that the statutory scheme was violated. There is no provision in the statute that talks about a cure. The trial court couldn't cure a violation. And even if one could humor that position, the second subpoena, which was photocopied, didn't contain the statutory language that is required to be on the body of the subpoena, which was sent to North Shore. So there was a double, a double violation. So that's my response. There was not a cure. It's been characterized as such. This is a strict liability statute. The act, finding of the act, is a violation. The next question is whether or not there is a damages hearing. At the second hearing, after the second subpoena was served, the court made a determination that it would not even conduct an in-camera inspection. And it would not disclose the records. It sealed the records. Now, this is the reverse order. That final determination by the court in January 2016, seven months after the unilateral serving of the subpoena, that is the result that should have obtained at the first step. Had the motion directed by the statute been filed by Attorney Pfeffer at the first step, the court would have made a determination whether or not any of the exceptions to the statute apply, for instance, putting one's mental state at issue. And the court would have, I suggest, at that stage denied the issuance of the subpoena. Instead, Pfeffer and his client, who had an expressed interest in using Ryan Gartner's mental health records to defend against the indirect contempt citation, and to gain an advantage in the underlying custody hearing, put him at risk mentally. Now, before you go on, you're saying the attorney and the client, but does the record have anything about the client's, Ms. Jacobs' participation in this? Yes. Ms. Jacobs told her lawyer about the existence of these records. Mr. Gartner was picked up and involuntarily committed to Northwestern Hospital, a psychiatric ward. Ms. Gartner knew about that, told her lawyer about it, and after those records were disclosed, she was aware that the proper procedure hadn't been followed, and she purposely clearly told Mr. Gartner that she was now going to use these records against him. That's a post-event ratification, which allows her to be responsible for Mr. Pfeffer's use of the subpoena. But there's no evidence, as I see it, in the record, that Ms. Jacobs instructed or encouraged or told her lawyer to get the records. I mean, it could be inferred, it could be guessed, it could be surmised, but there's no direct evidence of that, is there? Well, she did tell the lawyer about the records, and she did, again, after the subpoena was issued, she did have information because she... Again, after it was issued. Okay. Your complaint is that the statute was not complied with. That's right. So the fact of noncompliance, everything that happened after that, seems to me, may be irrelevant to whether the statute was complied with. Right? Well, yes. Okay. So to Judge Griffin's comment or question, there's really no direct evidence that she did anything to aid, abet, encourage her lawyer to seek out these records in the way they were sought out. Well, I beg to differ. Tell me what the evidence is. The post-first subpoena comments taught to Ryan that she's got it, that she's got the records. Remember, the records went to Pfeffer's office and were opened. But there's no evidence that she participated in getting those records, other than, let's assume you're correct, that she told her lawyer that these events happened and there should be records about them. Well, there's an inferential record at worst. And, of course, in summary judgment, all inferences are drawn in favor of the nonmoving party. And the Canula case specifically talks about ratification, which is a post-event action. So I do beg to differ. There is evidence, circumstantial evidence, and inferential evidence is as good as direct evidence. I think you're skipping over the point that the justices are making. You're referring to the second set of records when you refer to the records that were opened. I think what the justices are saying is that Ms. Jacobs may have told her lawyer about some incident and some records that possibly existed, but then it was the lawyer who sent the subpoena out without following the law. Ms. Jacobs may not even know what the law was at the time. Understood. She's a non-lawyer, I believe. Am I correct? She is a non-lawyer. Understood. But we can't look behind her invocation of the attorney-client privilege. And she invoked that. So we don't know what was said between the two. Well, I thought that she did invoke it, because I thought the deposition of the attorney and the client were taken, and they both denied conversations about this. Well, they invoked the privilege. Oh, did they? Yeah. They both what? They invoked the privilege. So we don't have, you know, we're not going to... That's not something that I'm not going to speak for the justices, but I would never hold that against an attorney or a client. I think that's the highest privilege on earth. And I agree, which is why we haven't argued that. But I simply make the point that if one is going to draw inferences, you know, given the general record and that those inferences ought to be drawn in favor of the non-moving party. Yeah, but you can't draw an inference unless there's evidence from which the inference can be drawn. If you have no evidence, looking at the record favorably to your client, if there's no evidence in the record that Ms. Jacobs, in my term, maybe not the correct term, aided, abetted, encouraged, sought, went and got the records herself or in conjunction with her lawyer, then there's no evidence from which to infer that she was part and parcel of the violation of the act. For summary judgment purposes, you have to have evidence in the record from which we could conclude from that evidence that she did participate. So, I mean, that's the point I'm trying to make. And again, I understand the point clearly, and I have not conceded and do not concede that the second subpoena, photocopied subpoena, was validly issued. It was not validly issued. And Ms. Jacobs had access to those records, presumably. We don't have any direct evidence that she saw them. But we do have her saying to her ex-husband that she was going to use those records against him. And so that's the inferential base that I urge on the Court. Did you say that that conversation between Ms. Jacobs and the plaintiff took place after the first set of records were delivered and before the second set were obtained? No, we believe that they were sent after the second subpoena was sent, the photocopied subpoena. Okay. Okay. That's when that conversation took place. Right. Okay. So you have a little bit more time we'll give you. One last point. Sure. The legislature was very clear about the procedures, the A, B, C, 1, 2, 3 procedures that must be followed before mental health records can be disclosed. The legislature didn't invest the Defendant's Counsel or invest the trial court with authority to change that procedure. The arguments made by the trial court in support of its motion for summary judgment are wrong. I feel very comfortable putting a full stop after wrong. Our arguments are clearly set out in the brief. The arguments presented by Defendant's Counsel are simply arguments in which they seek to amend the act. They seek to argue to this court that the court should create an exception for them. Thank you. Thank you. Thank you. Mr. Abbott? May it please the court, your honors, counsel, as I said before, I represent Jeremy Pfeiffer. I would like to clear something up factually with respect to your questioning of Mr. Odom regarding any discussions that my client had with Linda Garten. I want this to be very, very clear, although I do not represent her. My client, Jeremy Pfeiffer, clearly and unequivocally testified in his deposition that at no time did Linda Garten ever instruct him to do anything with respect to these records. This was his decision. It was his strategy in the underlying action. There was no communication between Linda and Mr. Pfeiffer. And just to give your honors a little more background in terms of how this came to be in the first place, Mr. Pfeiffer was retained by Linda Garten to defend her in two indirect criminal petitions that her ex-husband filed against her. My client is a criminal defense attorney. The way he learned about Ryan Garten's treatment at Evanston Hospital was because he was aware that he had been arrested on the night that he realized his marriage was coming to an end. He announced on Facebook to the world that his marriage was ending. He went down to Lake Michigan with threats against his own life, and the police arrested him and brought him to Evanston Hospital. Linda Garten never told my client, go get those records. There was no such discussion. Mr. Pfeiffer, being the criminal defense attorney that he is, reviewed the police report, and the police report specifically indicated that Ryan Garten was brought to Evanston Hospital for crisis intervention therapy. So that's the factual background in terms of what led to Mr. Pfeiffer issuing the subpoena in the first place. Was that in the record? Yes, it is in the record. It was the submission that was submitted for summary judgment? Correct. Mr. Pfeiffer was specifically asked about this, and he was very clear on the record. Linda, of course she never told me to do any of this. She's not a lawyer. This was my decision. Mr. Pfeiffer owns up to that. I want to make that very clear before I turn my attention to Mr. Pfeiffer, who is my client. With respect to Mr. Pfeiffer's subpoena, the first subpoena, we fully acknowledge that he dropped the ball. That's never been an issue. He did not have familiarity with the Mental Health Act, and that is not an excuse. However, that's not why we're here, and that wasn't the point of the summary judgment motion. What's very, very clear from the precedent in this district, which is Manziara v. Cannuli, is that this is not a strict liability statute, as Ryan Garten would have you believe. You never heard from Mr. Olin tell you that, in fact, it's not enough just to have a violation of the Mental Health Act in order to prove your action in a court of law. You need to prove causation, and you need to prove damages. How do we know that? Because this very district did a deep dive into these issues in Manziara v. Cannuli. So what I'd like to do, Your Honors, is talk a little bit about Manziara and highlight the clear differences between the outcome in that case and what happened in our case. So in Manziara, like in this case, there was an unfortunate end of a marriage, and one of the parties had sought treatment for mental health. And the other party hired an attorney with respect to the custody dispute that had been ongoing, and that attorney issued a subpoena without notice and without court order. The records not only were sent to the attorney, but when they went to court to address whether or not the prior custody decision would be affected at all by the ex-spouse's mental health treatment, the court reviewed the records in open court, specifically questioned this woman, who at that point had custody of her children per prior ruling, asked her about her mental health history in open court, and then reversed the custody decision. And what Manziara talks about very specifically is, and the reason why that summary judgment was overturned, there was in that case one summary judgment, but it was overturned, and for the right reason, because the First District pointed out at length that not only was there a violation of the statute, but that there were causation and damages issues that were issues of material fact which the lower court didn't get into at all. In other words, you can have a violation of the mental health statute, and as Judge Vega did in this very case, cure the error before any damage can be done as a result of the proximate cause of that error. And that's exactly what happened here. How did you get the second set of the records cured in effect at the first step? The second set of the records that were sent to Mr. Pfeiffer, as he indicated in his deposition, were brought to the court. Nobody reviewed them. They were never disclosed publicly, which is required to bring an action like this. But the court already had a set of records. I don't get how that cured it. Right? It already had a set. What Judge Vega was doing was curing the defective initial subpoena, because the initial subpoena did not give notice to Mr. Garten. And it was cured, and to answer your question, rather, the reason it was cured was because Mr. Garten was subsequently given an opportunity to be heard in writing and in open court to argue whether or not those records could be disclosed. And that's the very purpose of the Mental Health Act, after all. It's stated in the Act itself in the legislative history, and, again, in the Manziara case, it talks specifically about why do we have this Act. It's to give the recipients of the mental health treatment an opportunity to be heard, particularly in instances where there's a competing interest. And there was a competing interest in this case. Mr. Pfeiffer believed that if he could get those records admitted into evidence, that may help his client's case. However, what happened in this case, unlike in Manziara, and this is where there's clear differences, and why there is absolutely no way Mr. Garten could prove his case, because there's no causation and no damages. The Church never even reviewed the records in camera. How do we know there are no damages? We know there are no damages because there's no causal link between what he's claiming and the error that Mr. Pfeiffer initially made. That's not how you get to the issue of damages. To say that because there's no causal link, there's no damages. That doesn't even make sense. I'm trying to point out that you have to have causation and damages. You do, but that's not how you get to the issue of damages by saying, well, there's no damages because there's no causal link. They're two distinct issues. Correct. I agree. All right. I agree. I may have misunderstood you. I agree with that. But, again, if you look at the Manziarra case, they specifically talk about causation and damages. What this sounds like to me, this sounds like going into someone's home without an arrest warrant, without any existence circumstances, without any probable cause, arresting them from their bed, and then later on going before a judge and saying, hey, judge, just give us an arrest warrant now. That's what this sounds like to me. And I don't think that you can cure that. So, go ahead. Even if that's true, let's assume you're correct, Robert. Where's the causation and where's the damages in this case? There aren't any. There are none. Yeah, because Mr. Pierce just asked you, how do we know there are no damages? Because in the Manziarra case. No, in this case. Because nothing happened, Mr. Gardner. In the other line of action, there was no reversal of the decision. There was no change in the circumstances of the other line of action. Would you agree that the statute provides that anyone aggrieved by a violation of the statute can sue for damages? Yes. They have standing to do so. Right. I agree with that. Okay. So, if Mr. Gardner, he'd be aggrieved by the statute not being compliant, right? Possibly. It depends on the evidence. That's the whole point of Manziarra. It depends on the evidence, the specific evidence. In this case, yes. As a result of what? A violation of the statute or having damages? If the subpoena went out without compliance with the statute, right? Right. And the subpoena was for his mental health records. Failure to comply with the statute on its face would indicate he is aggrieved, correct? Would he not be aggrieved? I think you're confusing standing with an actual burden of proving your case. If he proved that my mental health records were obtained by the defendants without complying with the statute and said I am aggrieved, would he be an aggrieved party capable and legally entitled to sue those defendants for violation of the statute? Yes, I agree with that. Then, in order to recover something, he would have to establish damages, right? He would have to establish causation and damages, correct. That's exactly right. He alleged in his complaint that he was damaged by a violation of the statute. Judge Vega threw the case out saying you haven't shown damages. Now, as long as I've been practicing law, I've been under the impression that proving damages is a question of fact for the fact finder to determine, correct? I agree with you. You're confusing Judge Vega with Judge Ehrlich. Judge Ehrlich is the one who granted summary judgment. Judge Vega was the judge of the underlying action. Judge Ehrlich's written opinion could have been more artfully written. I think what he is getting at is causation plus damages. I agree with you. Generally speaking, damages, of course it's an issue of fact. Of course it is. So the plaintiff in this case pled that his records were obtained in violation of the statute, making him an aggrieved partner, and he's now seeking compensation for his damages. He pled that. Shouldn't he be entitled to a determination of whether he can prove damages? And that should be decided by the finder of fact, not in summary judgment? No. The answer is no. Proximate causation, which is absolutely required here, and again, I go back to Manziara because it's the one case that clearly applies to this situation. You have to prove proximate cause and damages. And the evidence in this case shows there is no causal link. But you have to prove them at the same time. You prove proximate cause first, and if you're able to prove proximate cause, then you go to damages. Torch 101. We start with a duty. No argument there. Right. Cause and fact. Next issue is proximate cause. Once there's proximate cause shown, that's a legal question. Then the next issue you get to is damages. But you're lumping them all together as if it's one thing, and it's not. No, I'm not lumping them together. I'm pointing out that these are elements that are required to prove your case. Let me tell you, this is just to ask you this question. You've stopped, and you've responded with proximate cause and damages. It's one issue at a time that's decided. Okay. And the issue here is not just damages. The issue is also proximate cause. That's the issue that Judge Ehrlich would have been deciding. But I'm acknowledging that damages is an issue of fact, generally speaking. I'm not disagreeing. Which would be decided by the jury. Right. The cases were allowed to go to trial. Sure. And so the issues that we have here are duty, cause and fact, proximate cause. Correct. And the problem here is that even though it was pled, and I'm not disputing that it was properly pled, which is why we didn't bring a motion to dismiss, and we didn't object to standing. This is the summary judgment stage. And at summary judgment, if there's no evidence of proximate cause, summary judgment should be granted. Okay. Do you have anything else you want to cover?  Sorry. Are you saying that the emotional distress isn't grounds for damages? Isn't the allegation here that the statute was violated, my records were turned over, and it caused me great mental? Are you saying it has to be like a cannula? It has to be implemented in the underlying case? I'm saying there has to be a causal link between the violation of the statute and the damages that he's seeking. Would it be that question in this case? No, because the evidence unequivocally shows there is no causal link between the two. Between him getting sick and having the mental stress and this? He can't link the two. In his deposition, he repeatedly testified that he was stressed over the fact that he had this custody dispute. He doesn't talk about it's because of the second subpoena that was sent to Mr. Pfeiffer and then handed up to the judge. There is no causal link. That's the problem with this. I fully agree that it was pled properly. It was. And I am conceding that damages generally is an issue of fact. You're right. And I would also acknowledge that. Here's what you're really missing, and I keep going back to torts 101. You have clearly there was a dispute. There's no issue there. Cause and fact, there was a violation of the statute. And then when you talk about approximate cause, the key issues that you generally look to towards 101, foreseeability, remoteness in time, remoteness in space, those are the issues that you look to to determine whether or not the causal link is the approximate cause of those damages. And the question is, we're not ruling today, but the question is whether or not it would be foreseeable that he would be damaged, whether or not there's remoteness in time, remoteness in space. Those are the issues that you look to to resolve the issue of approximate cause. I agree with you. And then once those issues are resolved, then the next question that you ask is whether or not there are any damages, which again is a question for the jury. But you continue to say that there were no damages because there was no causal link. And that's not how you determine whether or not there's damages. I understand that. I agree with you. I'm not disagreeing with you, Your Honor. Damages is something that would be considered by a jury, but he can't take his case to a jury because there's no causal link between his alleged damages and the alleged violation of the statute. His rights were not adversely affected. That's the whole point. His rights were not adversely affected by his records being divulged contrary to the procedures delineated in the statute. That's correct. He was given his opportunity to be heard. He had a lawyer who argued in court. Is there anything else you'd like to cover in your time? No, I will defer to my colleague. Thank you. Good afternoon, Your Honors. Good afternoon. Speaking on behalf of North Shore, there are some similar positions on these issues that we have with Mr. Pfeiffer. I do want to point out that the Confidentiality Act requires that certain warning language be included on subpoenas seeking medical records, mental health records, from medical records providers. In both instances, that language was missing. However, with respect to the first, the July subpoena, those records were sent directly to the court. And plaintiff has repeatedly misconstrued the holding in Manziara with respect to the hospital. In that case, and it's really in a prior summary order, but it is discussed in the main published opinion, in that case the court held that Section 10B of the Confidentiality Act protected the hospital from liability because they provided the records directly to the court. So this court was not concerned with the fact that a hospital may have provided records in technical violation of a subpoena, of the warning language, and the requirement that there be notice and a court order, as long as those records were brought to the court for the court to determine what to do with them. This is a clear case of no harm, no foul, and Manziara provides precedent for that July subpoena response that absolves North Shore of liability for that one. With respect to the second one, in November North Shore receives a fax that has the subpoena again, and it has a court order. The court order is a bit confusing, and I think reasonable minds can agree or disagree as to whether or not it clarified that they could produce the records while the parties had some time to object, and that's what North Shore did. They provided the records directly to Mr. Pfeiffer. Mr. Pfeiffer then, immediately realizing what was in those records, brings them to the next court appearance and hands them up at court and says, we got these, we haven't looked at them, no one's looked at them. Judge Vega takes them, he doesn't look at them. He holds them under seal and says, well, let's brief the underlying issue about whether or not these records are going to be admissible or used in some fashion in this criminal contempt proceeding. So the act itself provides for notice and an opportunity to be heard. That's the protection. And even though, to use Mr. Odom's analogy, even though steps 1, 2, 3, 4, 5 may not have been followed in chronological order, the goal of the statute, which is recognized in Manziarra, at least as to the hospital, is to give the patient an opportunity to know these are being sought, which he was given in the November hearing where the judge said, okay, you can reissue the subpoena and then we'll brief whether these are relevant, and an opportunity to be heard. And in fact, he won. Judge Vega did not find that these health records had any bearing on the indirect criminal contempt case. And Judge Vega ultimately sealed those records as well. So to date, no one has ever seen the records. What I think and I'm concerned that's being conflated here is the violation of the statute, which is the notice provisions, the process, the 1, 2, 3, 4, 5, that's the violation. And that violation has to be what gives rise to the alleged harm. The proximate cause here has to link to the technical violation of the statute and not to the fact that Mr. Garten found himself having to argue about whether the court should perform an in-camera review of those records to determine whether they would be used. So that's the missing link. And when Judge Ehrlich says, you know, nothing was said or done at the time of the hearing, nobody objected to the manner in which those records made their way to Judge Vega's desk, I believe what he was saying is that as part of the totality of circumstances lends itself to just no reasonable belief that you could tie the technical violation to the claim damages the emotional distress. I think we can all agree that having your mental health records at issue in a litigation, in a civil proceeding that's highly contested, highly emotional, would be upsetting. But you have to connect the upset that Mr. Garten claims he experienced directly as a result of and as a foreseeable result of not following one, two, three, four, five steps in order. And so that's why this is a far cry from Manziarra. With respect to the hospital, I think Manziarra controls the hospital's actions here too. But even with respect to the other defendants, it's a far cry from Manziarra whether actually what was harmed. You had a judge reading those records in open court. You had adverse rulings. Mr. Garten has not lost custody of his kids. His parenting arrangement has remained in place this entire time. Those records were not provided and reviewed in connection with a custody dispute. It was a criminal contempt case against his ex-wife. So to say that the damages complained of, we're giving him the benefit of the doubt on those damages, that he did experience those things. But he still has to establish that it would be foreseeable to North Shore that the violation of the statute where the records went directly to Judge Panarese and then later directly through to Judge Vega with a little pit stop at the Pfeiffer firm. A little pit stop. They didn't do anything. You have to connect that and those aspects to the damages complained of. And I think that's the piece here that Judge Ehrlich was getting at in looking at his comments about no harm, no foul. And in fact, if you look at the transcript from the January hearing, this is the one where the special prosecutor was arguing against the disclosure of those records. And the special prosecutor notes at that hearing that they were talking about the way in which those records made their way to the judge's desk. And she says, we talked about the original procedure that was supposed to be set forth and under that procedure, which Mr. Pfeiffer has now cured. So the procedure as to how those records got there, at the time it was assumed by everyone that that was cured. That they had figured out a way to make that right. Because ultimately, the rights afforded under the statute were rights that were provided and protected and ultimately did not have an adverse impact on any of Mr. Garten's legal rights. I believe there was a comment earlier by Mr. Odom about three sets of records, and I just wanted to clarify that because it made it sound, and maybe I put in here very well, it made it sound like he was saying, we provided one set to Judge Panarese and then a second set we sent out to Pfeiffer, and then we provided a third set to Judge Vega. That's not what happened. It's pretty clear in the record that there were only two sets. The second set went to Pfeiffer, who then provided it directly to Judge Vega. So you've only got two sets. Both of those are sealed. And to the extent that he complains that he's worried about who in the courthouse could possibly see these records, as an initial matter, we tried to mitigate it by seeking a clawback of those records. We didn't get them back. But I will also note that the Confidentiality Act provides for injunctive relief. So if the fear is that those records are out there and you're not adequately safeguarding them when they're under seal in a courthouse, he could have also sought an injunction, and he didn't. He's seeking monetary damages. Choice of remnants. Of course. His choice of remnants. No, absolutely. But that was his choice. And so to the extent he has put things in his briefing about how he's afraid that those records are out and floating around a courthouse somewhere where anyone could look at them, despite being told and in written court orders seeing that they were under seal, he's not mitigating damages. This is a remedial statute. And the judge commented in his oral ruling that you have to apply tort standards to a statute that's remedial the same as you would any other tort. And you give a great 101 law school torts summary of that, but it's duty, breach, proximate cause, and damages. But part and parcel of that is also mitigating damages and doing what you can in order to avoid harm. You can't just sit there and not do anything that would mitigate that. So it all is tied in together with that issue. Anything else? I don't believe so. Just the last part is on the aggrieved issue. I'll echo what Mr. Abbott said. That's a standing issue. The issue, if you're thinking about the Rosenbach v. Six Flags cases and what does that mean to be aggrieved, that was a pretty narrow issue that the Illinois Supreme Court looked at, which was can you be aggrieved by a violation of VIPA in order to be able to seek liquidated damages. And the court said yes. Here, in the absence of actual damages. Here, the confidentiality act does not permit you to get liquidated damages. And so that wouldn't even be part of the statute and the comparison wouldn't even be relevant to this case. Unless you were harmed. Well, right, exactly. But to look at it from a VIPA perspective of was there a violation, a technical violation, and do you need to have actual damages to proceed under claim or not, they of course put this as no because you can get liquidated damages or injunctive relief, which was the other one. And here, there's no liquidated damages. You have to have actual damages and they have to be the proximate result of the harm complained of. And here, that harm is a very narrow harm. It is the failure to go 1, 2, 3, 4, 5, that's it. It's not the records happened to be on the judge's desk at the time my rights were heard and the argument was made about whether those records should be used against me in this procedure. Thank you very much. Let me just, before we get to you, Ms. Rowe, Ms. Jacobs, we don't think there's any necessity for you to make any comments, okay? Everything's been covered by the other lawyers, so I think we're in good shape there. All right? Thank you. I thank counsel for correcting my error about three sets of records. I had that on my note to correct myself. On the issue of the attorney's instructions to the attorney, I want to clarify. The issue about the deposition of Pfeffer and his interaction with his client is the sword and shield issue. We simply have Pfeffer saying directly, she gave me no instructions. That's the extent of what they say. And she says, I gave him no instructions. They're using a shield. And they're forcing Ryan to guess whether or not there were any other interactions. The interactions with them, have we been able to discuss it? What did you say to him? When did you say it? Did you nod? Did you tell him that there were records which were harming to Ryan? You've got to agree that that would be so inappropriate. A lawyer-client relationship, y'all got to agree. I do agree. You've been representing clients all along. Yes, I do agree. But I raise it to clarify the issue about the invocation of the attorney-client privilege. We can't get behind it. We don't know what was said. And consequently, you don't have any evidence of it. Right. That's the bottom line. Now, this issue is just not a little pit stop for Ryan Garten. This is a guy who was throwing up, who had a multi-year battle with his spouse. Well, wouldn't you say to the defense position that, although we did not comply with the technical requirements of the statute, the protections that the statute affords your client, in effect, were accomplished because the judge, and only the judge, if you accept that Mr. Pfeiffer did not look at the records, the judge, knowing the judge had possession of the actual records, did an in-camera inspection, decided not to allow them to be used in any fashion in the divorce proceedings. So how does the agreed establish damages? First of all, this is not a remedial statute. The burden is not on the holder, the owner of the records. The statutory scheme was meant to protect those people who have mental health issues. One, from having their records disclosed inappropriately without their notice. Two, in public policy reason, encouraging them to seek mental health treatment. There is a chilling effect on people who have mental health issues if they think somehow their records are going to be by hook or crook. Right. So ultimately, if I can interrupt you, ultimately what you're saying is he's aggrieved, he's alleged damages, and it's up to a fact finder to decide whether the way they went about it entitles him to damages of a dollar or a dime. Right. Okay. Defenders conflate the violation steps with damages. Well, they try to make it a technical violation, therefore no damages, which is not the point. And the last point I want to make is in the Kanuli decision, there is language that specifically says the issue about when and whether the records leave the hospital, leave the hospital, is a question to be placed before the court, before the records leave the hospital. The records left the hospital twice here and one time went to the opposition's office and stayed there for three weeks. Thank you, Your Honor. Thank you. Thank you, everyone, for your briefing on this matter. We'll take the matter under advisement and we'll issue a decision forthwith.